Christopher B. Dalbey (SBN 285562)
*cdalbey@weitzlux.com*
Robin L. Greenwald (*pro hac vice* pending)
*rgreenwald@weitzlux.com*
James J. Bilsborrow (*pro hac vice* pending)
*jbilsborrow@weitzlux.com*
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, New York 10003
Telephone:  (212) 558-5500
Facsimile: (212) 344-5641

*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CATHRYN SALERNO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ANTHEM, INC. d/b/a Anthem Health, Inc., an Indiana Corporation; THE ANTHEM COMPANIES, INC., an Indiana Corporation,<br><br>Defendants. | Case No.  2:15-cv-01144<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## SUBJECT MATTER JURISDICTION

1.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from the Defendants' home state, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs.

## INTRODUCTION

2. Every business that collects and stores sensitive information about its customers has a duty to safeguard that information and ensure it is secure and remains private. That responsibility is most important where a business keeps and stores highly personal data such as the Social Security Numbers and medical, employment, and financial information belonging to its customers.

3. The data collected and stored by health insurance companies are among the most highly sensitive personally identifiable information. Health insurance companies, in turn, bear the crucial responsibility to protect this data from compromise and theft.

4. The threat of compromise and theft is significant. In the past several years, cyberattacks have occurred across all industries with increasing frequency. In 2014 alone, over one billion personal data records were compromised by cyberattacks.[1] The healthcare and health insurance industries have not been exempt from these attacks. Indeed, the Ponemon Institute, an independent cyber security research institution, has reported that approximately 90% of health care organizations reported that they were the victims of at least one data breach over the past two years.[2] Similarly, a 2014 report by the Identity Theft Resource Center warned that the medical and healthcare industry accounted for 42.5% of all data breaches in 2014.[3] The risk of cyberattack is known and undeniable; it is imperative

---

[1] CNBC, Year of the hack? A billion records compromised in 2014, http://www.cnbc.com/id/102420088# (last visited Feb. 15, 2015).

[2] *See* Ponemon Institute LLC, Fourth Annual Benchmark Study on Patient Privacy & Data Security 2 (Mar. 2014), http://www.ponemon.org/local/upload/file/ID%20ExpertsPatient%20Privacy%20%26%20Data%20Security%20Report%20FINAL1-1.pdf.

[3] Identity Theft Resource Center, Data Breach Reports (Dec. 31, 2014), http://www.idtheftcenter.org/images/breach/DataBreachReports_2014.pdf.

that healthcare and health insurance companies assume a corresponding duty to guard against this known risk and thwart preventable attacks.

5.     Defendant Anthem, Inc. is one of the largest health insurance companies in the United States. It operates coast to coast and currently insures approximately 37 million individuals. Unsurprisingly, Anthem, Inc. maintains a massive amount of personally identifiable information on its past and current insureds. Anthem, Inc. has a duty to take all reasonable measures to protect this information and safeguard it from theft.

6.     This lawsuit arises from Defendants' failure to fulfill their legal duty to protect the sensitive information of their customers. On February 4, 2015, Anthem, Inc. acknowledged that its systems had been hacked and the personal information of over 80 million past and current policy holders was compromised. Thieves stole, *inter alia*, Social Security Numbers, customer names, addresses, dates of birth, and employment information. This theft is the result of Defendants' failure to implement cyber security measures commensurate with the duties they undertook by storing vast quantities of sensitive customer data.

7.     Further, and to compound the harm caused to its customers, Anthem, Inc. has yet to fully and accurately inform those affected of the precise scope of the theft or the nature of the risks of identity theft. Many policy holders have not received any notification from the company at all. Others have received incomplete and/or confusing notice. This is unacceptable. It is incumbent upon Anthem, Inc. to provide information to those at risk so they may protect themselves and their families from further harm. As Connecticut Attorney General George Jepsen stated in a February 10, 2015 letter to the company,

> The delay in notifying those impacted is unreasonable and is causing unnecessary added worry to an already concerned population of Anthem customers. We are also

CLASS ACTION COMPLAINT

concerned that delays in providing protections to the victims of this breach compounds the risk they face.[4]

8.     In short, Defendants breached their duty to protect and safeguard their customers' personally identifiable information and to take reasonable steps to contain the damage caused where any such personally identifiable information was compromised.

9.     Plaintiff Cathryn Salerno therefore brings this action for herself and on behalf of all persons similarly situated who are or were insureds under a health insurance policy covered, sold, and/or written by Defendant Anthem, Inc., or other Blue Cross and Blue Shield plans affiliated with Defendant Anthem, Inc., as described more fully below. Because Defendants have failed to safeguard the personally identifiable information of their customers, they must stand to account before the law.

## PARTIES

10.     Plaintiff Cathryn Salerno is a citizen of the state of California and resides in the city of Santa Clarita. Ms. Salerno is currently insured under an Anthem policy affiliated with Blue Cross Blue Shield. She has been a policyholder for approximately ten years. Ms. Salerno's two minor children are also insured under her Anthem policy. As set forth in more detail below, Ms. Salerno has suffered harm because her personally identifiable information was compromised when Anthem's cyber security systems were breached beginning in and around December 2014. To compound matters, the personally identifiable information of Ms. Salerno's children was also compromised in this data breach.

---

[4] Letter from George Jepsen, Connecticut Attorney General, to Joseph Swedish, President and Chief Executive Officer of Anthem Inc. (Feb. 10, 2015), *available at* http://www.ct.gov/ag/lib/ag/press_releases/2015/20150210_anthembreach.pdf.

11.     Defendant Anthem, Inc., d/b/a Anthem Health, Inc. is an Indiana corporation registered with the California Secretary of State to do business in California. Anthem's corporate headquarters are located at 120 Monument Circle, Indianapolis, Indiana.

12.     Defendant The Anthem Companies, Inc. is an Indiana corporation, registered with the California Secretary of State to do business in California. The Anthem Companies, Inc. maintains corporate headquarters in Indianapolis, Indiana.

13.     Anthem Insurance Companies, Inc., a subsidiary of Anthem, provides healthcare benefits through Blue Cross and Blue Shield plans in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. Anthem also provides benefits through the following affiliated plans: Amerigroup, UniCare, CareMore, and HealthPlus Amerigroup.

14.     Anthem, Inc., The Anthem Companies, Inc., its subsidiaries, and affiliated healthcare plans are collectively referred to as "Anthem" in this Complaint.

**PERSONAL JURISDICTION AND VENUE**

15.     This Court has personal jurisdiction over Anthem because Anthem is licensed to do business in California, regularly conducts business in California, and has minimum contacts with California.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Anthem regularly conducts business and resides in this district, a substantial part of the events or omissions giving rise to these claims occurred in this district, and Anthem has caused harm to class members residing in this district.

CLASS ACTION COMPLAINT

**FACTUAL BACKGROUND**

*Anthem Collects and Stores Significant Quantities of Customer Data*

17.    Anthem is one the largest health insurance networks in the United States, and is the second largest insurer by market value.[5] In addition, Anthem is the largest for-profit managed health care company in the Blue Cross and Blue Shield Association. Anthem has more policyholders in California than any other insurer.

18.    Anthem understands that its customers place a premium on privacy. Thus, Anthem dedicates a section of its website to explain its privacy and data collection policies.[6]

19.    Anthem assures its customers that it "maintains policies that protect the confidentiality of personal information, including Social Security numbers, obtained from its members and associates in the course of its regular business functions." Further, Anthem "is committed to protecting information about its customers and associates, especially the confidential nature of their personal information (PI)."[7]

20.    In addition, Anthem's website explains that it "imposes a number of standards" to "guard the confidentiality of Social Security numbers and other personal information"; "prohibit the unlawful disclosure of Social Security numbers"; and "limit access to Social Security numbers."[8]

---

[5] *See* Anthem Hacked in "Sophisticated" Attack on Customer Data, Bloomberg Business, Crayton Harrison, Feb. 4, 2015, *available at* http://www.bloomberg.com/news/articles/2015-02-05/anthem-hacked-in-sophisticated-attack-exposing-customer-data (last visited Feb. 16, 2015).

[6] *See* https://www.anthem.com/health-insurance/about-us/privacy (last visited Feb. 16, 2015).

[7] *Id.*

[8] *Id.*

CLASS ACTION COMPLAINT

21.     As these statements make clear, Anthem is aware of the importance its customers place on privacy, as well as its duty to safeguard the personal information that its customers supply to it.

***The Anthem Data Breach***

22.     On or about December 10, 2014, hackers infiltrated Anthem's computer systems by gaining entry to a massive database of current and former customers' information.[9] This database contained as many as 80 million records of current and former Anthem customers and employees. For each affected customer, hackers were able to access the customer's name, date of birth, member identification, Social Security Number, address, phone number, email, employment information, and income data.

23.     Hackers operated inside Anthem's systems undetected for the next forty-eight days.

24.     On January 27, 2015, one of Anthem's database administrators noticed a database query being run using his credentials. The administrator stopped the query and notified Anthem's Information Security Department. Anthem claims that it secured its systems and stopped the breach on this date.

25.     It was not until one week later, on February 4, 2015, that Anthem disclosed publicly that hackers had breached its cyber security systems and potentially stolen the personal information of 80 million current and former

---

[9] Cyber security blogger Brian Krebs has argued that Anthem's systems may have been breached as early as April 2014. *See* Brian Krebs, Anthem Breach May Have Started in April 2014 (Feb. 15, 2015), *available at* http://krebsonsecurity.com/2015/02/anthem-breach-may-have-started-in-april-2014/ (last visited Feb. 9, 2015). Needless to say, the factual background underpinning this Complaint will likely be revised as more information regarding Anthem's breach is publicly disclosed.

1   customers and employees. All individuals insured by an Anthem policy beginning

2   in 2004 were affected by the breach.

3       26.    Anthem President and CEO Joseph R. Swedish issued a statement

4   accompanying the company's public disclosure. In it, he confirmed that "attackers

5   gained unauthorized access to Anthem's IT system and have obtained personal

6   information from our current and former members." Mr. Swedish's statement

7   further confirmed that the compromised data included "names, birthdays, medical

8   IDs/social security numbers, street addresses, email addresses and employment

9   information, including income data." Mr. Swedish claimed that "[b]ased on what

10  we know now, there is no evidence that credit card or medical information, such as

11  claims, test results or diagnostic codes were targeted or compromised."[10]

12      27.    In spite of Mr. Swedish's assurances, it is not independently known

13  whether the credit card information or medical information of current and former

14  Anthem customers was, in fact, compromised.

15      28.    Mr. Swedish's statement also assured the public that "Anthem will

16  individually notify current and former members whose information has been

17  accessed."[11]

18      29.    The statement of Mr. Swedish was sent to some Anthem customers on

19  February 4, 2015. Ms. Salerno received a copy of Mr. Swedish's statement via

20  email on February 4, 2015.

21      30.    Ms. Salerno has not, however, received individual notification

22  informing her whether or not her personal information, or the information of her

23  children, was accessed. Upon information and belief, no current or former Anthem

24  customers have yet received individual notification detailing whether their personal

25  information has been accessed and, if so, what information has been compromised.

26      [10] Statement of Joseph R. Swedish, *available at*

27  https://www.anthemfacts.com/ceo (last visited Feb. 16, 2015).

28      [11] *Id.*

31.    Cyber criminals took immediate advantage of Anthem's failure to communicate to its customers. Two days after Anthem's disclosure, news outlets reported that criminals were sending Anthem customers email correspondence that appeared to be from Anthem. These communications offered free credit monitoring services by clicking a link and providing personal information. In truth, any information provided was sent straight to scam artists.[12]

32.    Anthem's failure to communicate with affected individuals, and criminals' attempts to then fill the informational vacuum, has already raised significant concern among law enforcement nationwide. On February 10, 2015, ten attorneys general delivered a letter to Anthem expressing concern about Anthem's failure to communicate with its customers.[13] Indeed, the letter states, "The purpose of this letter is to express our alarm at the failure of the company to communicate with affected individuals and, in particular, to provide them details about the protections the company will make available and how to access those protections."[14]

---

[12] *See* Data Breach at Anthem May Forecast a Trend, New York Times, Reed Abelson & Julie Creswell, Feb. 6, 2015, *available at* http://www.nytimes.com/2015/02/07/business/data-breach-at-anthem-may-lead-to-others.html?smid=nytcore-iphone-share&smprod=nytcore-iphone&_r=0 (last visited Feb. 16, 2015).

[13] Letter from George Jepsen, Connecticut Attorney General, to Joseph Swedish, President and Chief Executive Officer of Anthem Inc. (Feb. 10, 2015), *available at* http://www.ct.gov/ag/lib/ag/press_releases/2015/20150210_anthembreach.pdf. The letter is written on behalf of the attorneys general of Arkansas, Connecticut, Illinois, Kentucky, Maine, Mississippi, Nebraska, Nevada, Pennsylvania, and Rhode Island.

[14] *Id.*

CLASS ACTION COMPLAINT

*The Value of the Stolen Data*

33.     The Anthem data breach is arguably the largest data breach to date at a major insurance company. Anthem and its affiliates insure one in nine Americans.[15]

34.     To compound the severity of the breach, hackers made off with personal information that is particularly valuable to thieves. The compromised data leaves Anthem customers especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

35.     Social Security Numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

36.     The Social Security Administration has warned that identity thieves can use an individual's Social Security Number and good credit score to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later.[16]

37.     Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

38.     The danger of identity theft is compounded when a minor's Social Security Number and personal information is compromised. Whereas adults can

---

[15] *See* Massive Data Hack of Health Insurer Anthem Potentially Exposes Millions, Washington Post, Fred Barbash & Abby Phillip, Feb. 5, 2015, *available at* http://www.washingtonpost.com/news/morning-mix/wp/2015/02/05/massive-data-hack-of-health-insurer-anthem-exposes-millions/ (last visited Feb. 16, 2015).

[16] Social Security Administration, Identity Theft and Your Social Security Number, http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Feb. 16, 2015).

periodically monitor their own credit reports, minors typically have no credit to monitor. Thus, it can be difficult to safeguard against fraud. Thieves who steal a minor's identity may use it for years before the crime is discovered.

39.    The incidence of fraudulent tax filings has increased dramatically over the past years. The IRS paid an estimated $5.2 billion in tax refunds obtained from identity theft in 2013, while it prevented an additional $24.2 billion in fraudulent transfers the same year.[17]

40.    In the wake of the Anthem breach, Kevin Sullivan, Connecticut's tax commissioner, urged taxpayers expecting state or federal tax refunds to file their taxes quickly in order to circumvent tax fraud attempts.[18]

41.    Another danger, according to the publisher of *Privacy Journal*, Robert Ellis Smith, is that thieves use stolen Social Security Numbers to obtain medical care in someone else's name.[19]

42.    Julie Ferguson, chairwoman of the Identity Theft Resource Center, called the data stolen from Anthem "the keys to the kingdom." She continued, "All of the information is enough to open new accounts or take over someone's accounts."[20]

---

[17] FBI Probes Rash of Fraudulent State Tax Returns Filed Through Turbo Tax, LA Times, Shan Li, Feb. 11, 2015, *available at* http://www.latimes.com/business/la-fi-turbotax-fbi-20150212-story.html (last visited Feb. 16, 2015).

[18] Commissioner Says Anthem Customers Should File Taxes Quickly, Hartford Courant, Feb. 8, 2015, *available at* http://www.courant.com/business/ct--anthem-hack-connecticut-20150208-story.html (last visited Feb. 16, 2015).

[19] Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR, Brian Naylor, Feb. 9, 2015, *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Feb. 16, 2015).

[20] Protecting Yourself from the Consequences of Anthem's Data Breach, New York Times, Tara Siegel Bernard, Feb. 5, 2015, *available at* http://www.nytimes.com/2015/02/06/business/protecting-yourself-from-the-

*Footnote continued on next page*

43.     What is more, it is no easy task to change or cancel a stolen Social Security Number. An individual cannot obtain a new Social Security Number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

44.     Even then, a new Social Security Number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[21]

45.     The personal information compromised in the Anthem breach is significantly more valuable than the credit card information that was compromised in the large retailer data breaches at Target and Home Depot. Victims affected by the retailer breaches could avoid much of the potential for future harm by cancelling credit or debit cards and obtaining replacements. The information compromised in the Anthem breach is difficult, if not impossible, to change— Social Security Number, name, date of birth, employment information, income data, etc.

46.     These data, as one would expect, demand a much higher price on the black market. Martin Walter, senior director at cyber security firm RedSeal, explained, "Compared to credit card information, personally identifiable

_____

*Footnote continued from previous page*
consequences-of-anthems-data-breach.html (last visited Feb. 16, 2015).

[21] Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR, Brian Naylor, Feb. 9, 2015, *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Feb. 16, 2015).

information and Social Security numbers are worth more than 10x on the black market."[22]

47.    This estimate may be low. A recent PriceWaterhouseCoopers report stated that an identity theft kit containing health insurance credentials can be worth up to $1,000 on the black market, while stolen credit cards may go for $1 each.

48.    Days after it disclosed the breach, Anthem announced that it would offer free credit monitoring services for two years. As security blogger Brian Krebs has explained, however, "the sad truth is that most services offer little in the way of real preventative protection against the fastest-growing crime in America [identity theft]."[23] Credit monitoring services, in other words, may inform individuals of fraud after the fact, but do little to thwart fraud from occurring in the first instance.

49.    The implications of the Anthem data breach are indeed serious. But these implications were known *ex ante*. Anthem should have—and could have—done more to fulfill its duty to safeguard the data with which its customers entrusted it.

### Anthem Failed to Safeguard Customer Data

50.    Two-layer, or multiple-layer, authentication is standard in the cyber security industry, especially where sensitive personal information is involved.

51.    In a multiple-layer authentication system, an employee can gain access to sensitive information only after clearing multiple security steps. The first "layer" typically requires an employee to enter a username and password. A second

---

[22] Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT World, Tim Greene, Feb. 6, 2015, *available at* http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Feb. 16, 2015).

[23] Brian Krebs, Are Credit Monitoring Services Worth It?, Krebs on Security, Mar. 4, 2014, http://krebsonsecurity.com/2014/03/are-credit-monitoring-services-worth-it/ (last visited Feb. 16, 2015).

CLASS ACTION COMPLAINT

"layer" then incorporates a key card, fob, or token that is swiped at a terminal or physically presented by the employee in some way. The second layer of authentication requires that the individual accessing the data also have the card, fob, or token in his or her hands.

52.     Two-factor authentication is at work every time a bank customer uses an Automated Teller Machine. One layer of authentication occurs when the customer slides his or her ATM card through the card reader. A second layer of authentication occurs when the user enters his or her Personal Identification Number.

53.     On February 10, 2015, Anthem's Chief Information Officer, Tom Miller, acknowledged in a presentation that Anthem did not require employees to provide at least two layers of authentication in all areas of its computer system. Rather, the company required only a single layer of authentication: the input of employee passwords.

54.     Miller further acknowledged that hackers obtained the passwords of several employees.

55.     In a classic moment of too-little-too-late, in the days after the breach Anthem reworked all of its IT accounts with privileged access to sensitive information to require two layers of authentication.

56.     In addition to its failure to require sufficient layers of authentication, Anthem also neglected to take the basic step of encrypting the data contained in its massive customer database. "Encryption" refers to the process of converting, or scrambling, personal information into coded strings that would not be immediately useful, or even identifiable, to thieves. Anthem instead stored its customers' personal information in plain text, meaning that it was readily usable by anyone who could read.[24]

---

[24] *See* Anthem Hacking Points to Security Vulnerability of Health Care Industry, New York Times, Reed Abelson & Matthew Goldstein, Feb. 5, 2015,

*Footnote continued on next page*

CLASS ACTION COMPLAINT

57.     The Health Insurance Portability and Accountability Act (HIPAA) and regulations promulgated thereto require entities such as Anthem to ensure the confidentiality and integrity of all electronic protected health information that the entity creates, receives, maintains, or transmits. *See* 45 C.F.R. § 164.306(a). Further, a covered entity must protect against "reasonably anticipated threats." *Id.* Encryption is strongly encouraged. Entities that do not encrypt data must implement an equivalent alternative measure and document the reason or reasons that encryption was not reasonable. *See* 45 C.F.R. § 164.306(d).

58.     Yet Anthem did not use encryption of customer data. It has ignored the standards set forth in HIPAA. Anthem's failure to abide by these standards has exposed its customers' personal information to hackers unobstructed by the hurdles that encryption may have raised.

### Anthem Has a History of Cyber Security Failures

59.      This is not the first time that Anthem, or its corporate predecessor Wellpoint, has failed to safeguard its customers' personal and sensitive information.[25]

60.     In January 2007, Wellpoint  lost customer files containing names and Social Security Numbers for 196,000 Blue Cross Blue Shield customers in four US states.[26]

61.     In February 2007, Wellpoint notified 75,000 Empire Blue Cross Blue Shield members that it had lost a disc containing their Social Security Numbers,

---

*Footnote continued from previous page*
*available at* http://www.nytimes.com/2015/02/06/business/experts-suspect-lax-security-left-anthem-vulnerable-to-hackers.html (last visited Feb. 16, 2015).

[25] Wellpoint changed its corporate name to Anthem in December 2014.

[26] Data on 196,000 Insurance Customers Stolen, *available at* http://www.upi.com/Business_News/2007/02/15/Data-on-196000-insurance-customers-stolen/UPI-34661171554687/ (last visited Feb. 16, 2015).

CLASS ACTION COMPLAINT

health plan identification numbers, and descriptions of medical services dating back to 2003.[27]

62.    Between April 2007 and June 2008 Wellpoint failed to properly secure two computer servers that contained non-public personal and health information of UniCare members. UniCare was a subsidiary of Wellpoint. This breach resulted in a class action settlement with the affected customers in July 2011.[28]

63.    In August 2009, Anthem Blue Cross Blue Shield of Connecticut lost a laptop containing the personal information, including Social Security Numbers, for nearly 19,000 health professionals. Anthem did not inform these individuals until October of that year that their data was compromised. The Connecticut Attorney General thereafter accused Anthem of violating state disclosure and data-security laws.[29]

64.    Between October 2009 and March 2010, Wellpoint improperly stored personal and electronic versions of individual health insurance applications for over 600,000 customers, enrollees or subscribers on its web-based servers without implementing username, password, and encryption protections.[30]

---

[27] *See* Medical Data on Empire Blue Cross Members May Be Lost, New York Times, Milt Freudenheim, Mar. 14, 2007, *available at* http://www.nytimes.com/2007/03/14/business/14insure.html?_r=1&oref=slogin (last visited Feb. 16, 2015).

[28] http://www.phiprivacy.net/follow-up-unicare-life-health-insurance-class-action-settlement/ (last visited Feb. 16, 2015).

[29] CT AG to Investigate Anthem Blue Cross Breach, PHIprivacy.net, Nov. 9, 2009, *available at* http://www.phiprivacy.net/ct-ag-to-investigate-anthem-blue-cross-breach/ (last visited Feb. 16, 2015).

[30] *See Blue Cross of California Website Security Cases* (California Superior Court JCCP 4647), *available at* http://anthembluecrosssecuritysettlement.com/SettlementAgreement.pdf (last visited Feb. 16, 2015).

65.    The Department of Health and Human Services also filed suit against Wellpoint for this breach. Wellpoint paid $1.7 million to settle those claims. In addition, Wellpoint acknowledged that it

> failed to implement appropriate security procedures and policies prior to allowing access to ePHI, therefore violating HIPAA security policies. The company also failed to perform technical evaluations of system security following software upgrade and failed to utilize adequate technology to identify users seeking access to sensitive information.[31]

66.    In April 2011, Anthem Blue Cross printed Social Security Numbers on letters mailed to more than 33,000 Medicare Supplement and Medicare Part D subscribers. Anthem repeated this infraction in a second mailing between December 2011 and March 2012. The California Attorney General sued Anthem for violating a California law proscribing the disclosure of Social Security Numbers, and Anthem settled the suit and agreed to implement new safeguards for its data management system.[32]

67.    In November 2013, Anthem Blue Cross acknowledged that it posted online the Social Security Numbers or tax identification numbers for 24,500 California doctors.[33]

68.    As these incidents demonstrate, Anthem has a long history of mishandling the security of the data it collects and stores.

---

[31] *Id.*

[32] California Settles with Anthem Blue Cross Over Data Breach, PHIprivacy.net, Oct. 1, 2012, *available at* http://www.phiprivacy.net/california-settles-with-anthem-blue-cross-over-data-breach/ (last visited Feb. 16, 2015).

[33] Anthem Blue Cross Posts Social Security, Tax Numbers of 24,500 Doctors, LA Times, Chad Terhune, Nov. 25, 2013, *available at* http://www.latimes.com/business/la-fi-mo-anthem-doctors-breach-20131125-story.html (last visited Feb. 16, 2015).

CLASS ACTION COMPLAINT

*The Healthcare and Health Insurance Industry is on Notice that it is a Target of Cyber Thieves*

69.     Healthcare and health insurance companies are well aware that they are the target of cyber thieves, yet the industry has failed to implement the cyber security reforms implemented across other industries.

70.     Martin Walter, senior director at RedSeal, has stated that companies in the healthcare industry "in comparison spend significantly less on security, making them tentatively easier targets."[34] Cyber security analysts generally believe that the healthcare industry lags far behind other industries when it comes to cyber security.[35]

71.     The events of 2014 alone should have placed Anthem on notice of the need to improve its cyber security systems. In August, Community Health Systems, the second largest for-profit hospital chain in the United States, was hacked and the Social Security Numbers of 4.5 million customers were stolen. This prompted a "flash warning" by the FBI to entities in the healthcare industry, including Anthem, that it had observed "malicious actors targeting health care related systems, perhaps for the purpose of obtaining Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[36]

---

[34] Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT World, Tim Greene, Feb. 6, 2015, *available at* http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Feb. 16, 2015).

[35] *See* Data Breach at Anthem May Forecast a Trend, New York Times, Reed Abelson & Julie Creswell, Feb. 6, 2015, *available at* http://www.nytimes.com/2015/02/07/business/data-breach-at-anthem-may-lead-to-others.html (last visited Feb. 16, 2015).

[36] FBI Warns Healthcare Firms They Are Targeted By Hackers, Reuters, Aug. 20, 2014, *available at* http://www.reuters.com/article/2014/08/20/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820 (last visited Feb. 16, 2015).

CLASS ACTION COMPLAINT

72.    Earlier in the year, over 12,000 patients' records were compromised when hackers gained access to the accounts of employees of Centura Health Systems of Colorado Springs. This event was preceded by a breach at Texas's St. Joseph Health System compromising 405,000 patient records.

73.    The history of cyber security breaches at Anthem, and in the industry more generally, and the warnings that are now all but ubiquitous, have placed companies operating in the industry on notice of the duty to safeguard customers' personal information. If anything, this history of failure should spur greater efforts to implement top-of-the-line cyber security measures that exceed the industry standard. Indeed, customers expect that healthcare companies will take every precaution to safeguard their personal information. The unfortunate reality, as Les Funtleyder, a health care portfolio manager, observed, is that "health care has been very slow to adopt almost every technological advance. Right now, a lot of health care companies are sitting ducks."[37]

## CLASS ACTION ALLEGATIONS

74.    Plaintiff brings this lawsuit as a class action on her own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

75.    The proposed nationwide class is defined as:

**Nationwide Class**
All persons in the United States who were insured by Anthem from 2004 to January 27, 2015.

---

[37] Indianapolis Business Journal, *Anthem's IT System Had Cracks Before Hack*, J.K. Wall, Feb. 14, 2015, http://www.ibj.com/articles/51789-anthems-it-system-had-cracks-before-hack (last visited Feb. 16, 2015).

76.     Plaintiff also brings this action on behalf of a California State Class, defined as:

> **California Class**
> All persons who purchased health insurance from an Anthem company in California from 2004 to January 27, 2015.

77.     Excluded from the Class are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) governmental entities. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses or modified in any other way.

## Numerosity and Ascertainability

78.     Although the exact number of class members is uncertain and can be ascertained only through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these class members in a single action will provide substantial benefits to all parties and to the Court. Class members are readily identifiable from information and records in Anthem's possession, custody, or control.

## Typicality

79.     Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all class members, was insured by an Anthem health insurance policy. Plaintiff, like all class members, has been damaged by Anthem's conduct in that her personal information, including her Social Security Number, has been compromised by Anthem's failure to fulfill its duties under the law. Further, the factual bases of

Anthem's misconduct are common to all class members and represent a common thread of misconduct resulting in injury to all class members.

## **Adequate Representation**

80.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class action, and therefore Plaintiff's counsel is also adequate under Rule 23.

81.    Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel has interests adverse to those of the Class.

## **Predominance of Common Issues**

82.    There are numerous questions of law and fact common to Plaintiff and the class members that predominate over any question affecting only individual class members. The answers to these common questions will advance resolution of the litigation as to all class members. These common legal and factual issues include:

a.    whether Anthem owed a duty to Plaintiff and members of the Class to take reasonable measures to safeguard their personal information;

b.    whether Anthem owed a duty to Plaintiff and members of the Class to provide timely and adequate notice of the Anthem data breach and the risks posed thereby;

c.    whether Anthem knew or should have known that its cyber security systems were vulnerable to attack;

d.    whether Anthem's breach of a legal duty caused its cyber security systems to be compromised, resulting in the loss and/or potential loss of 80 million member files;

CLASS ACTION COMPLAINT

e.     whether Anthem violated California Business and Professions Code § 17200 *et seq.*;

f.     whether Plaintiff and class members are entitled to recover actual damages, statutory damages, and/or punitive damages; and

g.     whether Plaintiff and class members are entitled to restitution, disgorgement, and/or other equitable relief.

## **Superiority**

83.   Plaintiff and class members have all suffered and will continue to suffer harm and damages as a result of Anthem's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

84.   Absent a class action, most class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual class members' claims, it is likely that only a few class members could afford to seek legal redress for Anthem's misconduct. Further, without class litigation, class members will continue to incur damages and Anthem is likely to repeat its misconduct.

85.   Class treatment of common questions of law and fact is also a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

# CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Negligence
### (Asserted on Behalf of the Nationwide Class)

86.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

87.    Anthem required Plaintiff and class members to submit non-public personal information in order to acquire coverage under a health insurance policy. Anthem collected and stored this data. It therefore assumed a duty of care to use reasonable means to secure and safeguard its customers' personal information, to prevent disclosure of the information, and to guard the information from theft.

88.    Anthem breached its duty of care by failing to secure and safeguard the personal information of Plaintiff and the Class.

89.    Given the risks associated with data theft, Anthem also assumed a duty of care to promptly and fully notify and inform its customers should their personal information be compromised and/or stolen.

90.     Anthem breached this duty of care, and continues to breach this duty of care, by failing to share crucial information with Plaintiff and the Class.

91.    Plaintiff and the Class have suffered harm as a result of Anthem's breach. The personal information of Plaintiff and the Class have been exposed, subjecting each member of the Class to identity theft, credit and bank fraud, Social Security fraud, tax fraud, and myriad other varieties of identity fraud.

92.    Plaintiff and the Class have suffered monetary damages and will continue to be injured and incur damages in the future both in an effort to protect themselves and to remedy acts of fraudulent activity.

CLASS ACTION COMPLAINT

## SECOND CLAIM FOR RELIEF

### Negligence Per Se
### (Asserted on Behalf of the Nationwide Class)

93.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

94.     Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Anthem had a duty to secure and safeguard the personal information of its customers.

95.     Anthem violated HIPAA by failing to secure and safeguard the personal information entrusted to it by Plaintiff and the Class. Further, Anthem failed to implement protections against "reasonably anticipated threats," and failed to encrypt customer data or implement an equivalent alternative measure and document the reason or reasons that encryption was not reasonable.

96.     Anthem's failure to comply with HIPAA and regulations promulgated thereto constitutes negligence per se.

## THIRD CLAIM FOR RELIEF

### Violation of the California Data Breach Act
### Cal. Civ. Code § 1798.80 *et seq.*
### (Asserted on Behalf of the California Class)

97.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

98.     Section 1798.82 of the California Civil Code provides, in pertinent part, that:

> (a) Any person or business that conducts business in California, and that owns or licenses computerized data that includes personal information, shall disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been,

acquired by an unauthorized person. The disclosure shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subdivision (c), or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system.

99.   The compromise of Social Security Numbers, customer names, addresses, dates of birth, and employment information, including income data, constitutes "personal information" as defined by California law.

100.   A "breach of the security system," as defined by statute, is "an unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of personal information maintained by the person or business." Cal. Civ. Code § 1798.82(g).

101.   The data breach described in this Complaint constitutes a "breach of the security system" under California law.

102.   Where a "breach of the security system" occurs, California law requires that the breached entity "issue a security breach notification" that shall be written in plain language and includes: the name and contact information of the reporting person or business; a list of the types of personal information that were or are reasonably believed to have been compromised; the date (or an approximate date) of the breach; whether notification was delayed because of a law enforcement investigation; a general description of the breach; and the toll-free telephone numbers and addresses of major credit reporting agencies if the breach exposed Social Security Numbers. Cal. Civ. Code § 1798.82(d).

103.   Anthem failed to provide notice of the breach that comports with Civil Code § 1798.82(d).

104.   Upon information and belief, no law enforcement agency instructed Anthem that notification of the Class would impede an investigation.

105.   Plaintiff and the Class are entitled to statutory damages as a result of Anthem's violation of § 1798.82. Pursuant to Cal. Civ. Code § 1798.84, Plaintiff

1  and the Class seek remedies, including actual damages suffered by the Class,

2  statutory damages for Anthem's willful, intentional, and/or reckless conduct, and

3  equitable relief.

4      106.   Plaintiff and the Class also seek reasonable attorneys' fees and costs

5  under Cal. Civ. Code § 1798.84(g).

6

7  ### FOURTH CLAIM FOR RELIEF

8  **Violation of the California Confidentiality of Medical Information Act**

9  **Cal. Civ. Code § 56 *et seq.***

10  **(Asserted on Behalf of the California Class)**

11      107.   Plaintiff hereby incorporates by reference the allegations contained in

12  the preceding paragraphs of this Complaint.

13      108.   Anthem is a provider of health care within the meaning of Civil Code

14  § 56.06(a) and maintains medical information as defined by Civil Code § 56.05(g).

15      109.   Plaintiff is a patient of Anthem, as defined in Civil Code § 56.05(h).

16  Anthem maintains personal medical information of Plaintiff and the Class.

17      110.   Anthem has misused and/or disclosed medical information regarding

18  Plaintiff without written authorization compliant with the provisions of Civil Code

19  §§ 56 *et seq.*

20      111.   Anthem's misuse and/or disclosure of medical information regarding

21  Plaintiff and the Class constitutes a violation of Civil Code §§ 56.10, 56.11, 56.13,

22  and 56.26.

23      112.   Plaintiff and the Class have suffered damages from the improper

24  misuse and/or disclosure of their medical information and therefore Plaintiff and the

25  Class seek relief under Civil Code §§ 56.35 and 56.36.

26      113.   Plaintiff and the Class seek actual damages, statutory damages,

27  statutory penalties, attorneys' fees, and costs pursuant to Civil Code §§ 56.35 and

28  56.36.

CLASS ACTION COMPLAINT

**FIFTH CLAIM FOR RELIEF**

**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200 *et seq.***
**(Asserted on Behalf of the California Class)**

114.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

115.   Anthem engaged in unfair, unlawful, and fraudulent business practices in violation of the UCL.

116.   California Business & Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

117.   Anthem violated the UCL by taking possession of the personal information of Plaintiff and the class members but then failing to take reasonable steps to secure and safeguard this information. Anthem violated its legal duty of care, and failed to abide by industry standard best practices for cyber security. In so doing, Anthem failed to fulfill its customers' reasonable privacy expectations. In addition, at no time did Anthem inform its customers that its cyber security systems were unreasonably susceptible to cyber theft.

118.   Anthem also violated the UCL by failing to provide timely notice of the data breach that comports with California law, as set forth herein. This violation is continuing, for Anthem has still failed to properly notify its customers of the data breach in a manner that comports with California law.

119.   Anthem's wrongful acts and practices also constitute "unfair" business acts and practices because the harm caused by Anthem's conduct outweighs the utility of the conduct, and because the conduct offends public policy and has caused (and will continue to cause) substantial injury to consumers, including Plaintiff and the Class. Anthem could reasonably have implemented industry best practices to protect the persona information of its customers but it failed to do so.

CLASS ACTION COMPLAINT

120.   Anthem's unlawful and/or unfair business acts and practices continue to this day. As a result of these unlawful and/or unfair business acts, Plaintiff and the Class have suffered injury and financial harm stemming from the Anthem data breach. Plaintiff and the Class are entitled to compensation, restitution, disgorgement or other equitable relief for these harms. The harm suffered by Plaintiff and the Class includes, but is not limited to damage to credit score and credit reports; lost time and expense relating to identity theft protection and prevention, cancelling or monitoring credit and bank cards, credit monitoring, placing limits on credit and bank activity; late fees and/or declined payment fees associated with failed automatic payments; lost productivity costs. Each of these harms can and will be monetized and proven at trial.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of herself and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

A.   an order certifying the proposed Class designating Plaintiff as the named representative of the Class, and designating the undersigned as Class Counsel;

B.   an order awarding Plaintiff and the Class relief, including actual and statutory damages, restitution, and disgorgement;

C.   an injunction ordering Anthem to immediately notify each individual whose personal information was compromised or an order awarding Plaintiff and the Class preliminary or other equitable or declaratory relief as may be appropriate by way of applicable state or federal law;

D.   any additional orders or judgments as may be necessary to prevent further unlawful practices and to restore to any person in interest any money or property that may have been acquired by means of the violations;

E.   an award of attorneys' fees and costs, as provided by law;

CLASS ACTION COMPLAINT

F.      an award of pre-judgment and post-judgment interest, as provided by law;

G.      leave to amend this Complaint to conform to the evidence produced at trial; and

H.      any other favorable relief as may be available and appropriate under law or at equity.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: February 17, 2015          WEITZ & LUXENBERG, P.C.


By:    /s/ Christopher B. Dalbey


Christopher B. Dalbey
*cdalbey@weitzlux.com*
Robin L. Greenwald (*pro hac vice* pending)
*rgreenwald@weitzlux.com*
James Bilsborrow (*pro hac vice* pending)
*jbilsborrow@weitzlux.com*
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, NY 10003
Telephone:   (212) 558-5500
Facsimile:    (212) 344-5466

*Attorneys for the Plaintiffs*

CLASS ACTION COMPLAINT